**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BILL WAGNER & SON, INC., on behalf of itself and all others similarly situated, | |
| *Plaintiff*, | Case No. _____ |
| v. | **CLASS ACTION COMPLAINT** |
| ATKORE INC., CANTEX INC., DIAMOND PLASTICS CORPORATION, IPEX USA LLC, PIPELIFE JET STREAM, INC., J-M MANUFACTURING COMPANY, INC. D/B/A JM EAGLE, NATIONAL PIPE & PLASTICS, INC., OTTER TAIL CORPORATION, NORTHERN PIPE PRODUCTS, INC., OIL PRICE INFORMATION SERVICE, LLC, PRIME CONDUIT, INC., VINYLTECH CORPORATION, SANDERSON PIPE CORPORATION, WESTLAKE CORPORATION, AND WESTLAKE PIPE & FITTINGS CORPORATION (F/K/A NAPCO PIPE & FITTINGS) D/B/A NORTH AMERICA PVC PIPE CORPORATION, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff Bill Wagner & Son, Inc. ("Plaintiff") brings this action individually and on behalf of a class of all persons and entities similarly situated (the "Class"), for damages and injunctive relief under the antitrust laws of the United States against the following 12 groups of defendants: (1) Atkore Inc., (2) Cantex Inc., (3) Diamond Plastics Corporation, (4) Ipex USA LLC, (5) J-M Manufacturing Company, Inc. d/b/a JM Eagle, (6) National Pipe & Plastics, Inc., (7) Oil Price Information Service, LLC, (8) Otter Tail Corporation and its wholly owned subsidiaries Northern Pipe Products, Inc. and Vinyltech Corporation, (9) Pipelife Jet Stream, Inc., (10) Prime Conduit, Inc., (11) Sanderson Pipe Corporation, and (12) the Westlake Group Defendants, comprised of Westlake Corporation and its wholly owned subsidiary Westlake Pipe & Fittings Corporation d/b/a North America PVC Pipe Corporation, (collectively, the "Defendants").

## I.     <u>NATURE OF THE ACTION</u>

1. This civil antitrust action seeks damages and injunctive relief arising out of the PVCP manufacturers are also referred to as converters and will be referred to hereafter as Converter Defendants. The collusive and concerted restraint of trade in PVC pipes ("PVCPs") by the Converter Defendants. has been from at least April 1, 2021, to the present (the "Class Period"). The Converter Defendants have been direct competitors and leading manufacturers of PVCPs in the United States and its territories. But for Defendants' collusive conduct as alleged herein, Plaintiff and members of the Class Plaintiff seeks to represent would not have paid—and would not continue to pay—artificially inflated prices for PVCPs.

2. PVCPs are made of polyvinyl chloride, a plastic that is made by combining chlorine and ethylene. The major types of PVCPs are: (1) plumbing PVCPs: pipes used in plumbing and drainage in residential and commercial settings; (2) conduit PVCPs: pipes used in electrical conduit and ductwork for heating and cooling systems; and (3) municipal PVCPs: pipes used in

1

municipal water and sewer systems. PVCP is a popular choice for piping because it is strong, durable, easy to install, and inexpensive. It is also corrosion resistant, has a smooth surface that allows for easy flow, and has low bacterial growth. PVCP is also considered environmentally sound and has a long service life.

3.     In 2023, the worldwide PVCP market was valued at approximately $45 billion. In 2023, the North American PVCP market was valued at $14.15 billion.

4.     Together, the Converter Defendants control more than 95% of PVCPs sold in the United States.

5.     Defendant Oil Price Information Service, LLC ("OPIS") is a price reporting agency that distributes a report called the "ProtoChem Wire PVC & Pipe Weekly" ("OPIS Report") to subscribers. This report provides a summary of the current conditions of the PVC pipe market, gathers and reports information from market participants, and provides a "high," "low," and "midpoint" price for finished PVC pipe and is the "only pricing source for finished PVC Pipe - municipal, plumbing and conduit."

6.     OPIS receives from PVCP converters a daily inflow of information, including prices, transactions, and projections and provides those PVCP converters with reports that include benchmark prices, which the converters rely on to set their prices for PVCPs.

7.     PVCP converters orchestrate and maintain their conspiracy via the OPIS Reports. Through this intermediary, PVCP converters coordinate pricing strategies, share competitively sensitive information, make offers to collude, intimidate market participants who may be tempted to lower prices, and fix prices for PVCPs.

8.     Defendants' price-fixing scheme has resulted in massively inflated PVCP prices and profit margins. These prices and profit margins defy economic logic, remaining at elevated

levels despite normalized supply chains, normalized input costs (PVC resin), and weak demand. For example, municipal PVCP prices and conduit PVCP prices currently remain 4.7 times and 2.7 times above pre-Covid levels, respectively, according to OPIS.

9.     Figure 1 below shows the Bureau of Labor Statistics ("BLS") producer price indexes for "Plastic Pipe and Pipe Fitting Manufacturing (326122)," which includes PVC pipe manufacturing, and "Plastics Materials and Resin Manufacturing (325211)," which includes PVC resin. PVC resin is an input for PVCPs, and therefore its price represents a cost for producing PVCPs. Representative companies under the North American Industry Classification System ("NAICS") code for 326122 and 325211, include JM Eagle and Westlake, respectively.

Figure 1: BLS Pipe Series for Pipes and Resin



10.     Figure 2 is a graph that illustrates the ratio of PVCP to PVC resin prices, as reported by the BLS. As is clear from the figure, the ratio of pipe to resin price was fairly stable at approximately 1.5 until approximately April 2021, when PVCP shot up to be 50 percent more expensive than resin,:



11.     Figure 3 shows the PVCP and PVC resin price series, with a forecasted value for PVCP beginning in April 2021. Between January 2014 and March 2021, the average monthly ratio of PVC pipe to resin prices is 1.397 (1.4 rounded). This ratio is then applied to the resin price series beginning in April 2021 to derive the forecasted price for PVCP. In theory, the difference between the actual price of PVCP and the forecasted price, based on the price of resin, is an indicator of the harm to Plaintiff and class members or the overcharge:

4



## II.  JURISDICTION AND VENUE

12.    Plaintiff brings this action on its own behalf as well as that of the proposed Class under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff resulting from Defendants' violation of 1 of the Sherman Act, and to secure injunctive relief against Defendants under Section 16 of the Clayton Act (15 U.S.C. § 26).  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, 15 U.S.C. § 15, and 15 U.S.C. § 26.

13.    Venue is proper in this District under 15 U.S.C. §§ 15(a); 22, 26 and 28 U.S.C. §§ 1391(b); (c); and (d) because during the relevant period, Defendants resided, transacted business,

were found, or had agents in this District, and a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

14.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

15.     This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District and the state of Illinois – has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy.  The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District and the state of Illinois.

### III.     PARTIES AND UNNAMED CO-CONSPIRATORS

#### A.     Plaintiff

16.     Plaintiff Bill Wagner & Son, Inc. is a New Jersey corporation with its principal place of business in Freehold, New Jersey. During the Class Period, Plaintiff purchased PVC pipes directly from one or more of the Converter Defendants and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

#### B.     Defendants

17.     Defendant OPIS is a privately owned Delaware corporation with its principal place of business at 9841 Washingtonian Blvd, 5th Floor, Gaithersburg, MD 20878. OPIS publishes benchmark prices for a variety of commodities, including chemicals and plastics. In 2018, OPIS acquired PetroChem Wire, a series of daily and weekly reports that covers the entire U.S.

petrochemical market, including PVC and PVC pipe. In 2022, News Corp acquired OPIS from S&P Global and IHS Markit and merged it with Dow Jones. OPIS publishes the PetroChem Wire PVC & Pipe Weekly report that provides a summary of benchmark prices and market conditions for industry participants.

**Converter Defendants**

### 1. Atkore

18. Defendant Atkore Inc. (""Atkore") is a Delaware corporation with its principal place of business at 16100 South Lathrop Avenue, Harvey, Illinois 60426. During the Class Period, Atkore or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 2. Cantex

19. Defendant Cantex Inc. ("Cantex"), a Delaware corporation, is a wholly owned subsidiary of Japan based Mitsubishi Corporation with its principal place of business at 301 Commerce St., Suite 2700, Fort Worth, Texas. During the Class Period, Cantex or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 3. Diamond

20. Defendant Diamond Plastics Corporation ("Diamond") is a Delaware corporation with its principal place of business at 1212 Johnstown Road, Grand Island, NE 68803. During the Class Period, Diamond or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 4. IPEX

21.    Defendant IPEX USA LLC ("IPEX") is a wholly-owned subsidiary of Belgium based Aliaxis sa/nv and is a Delaware corporation with its principal place of business at 10100 Rodney St, Pineville, NC 28134. During the Class Period, IPEX or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 5. JM Eagle

22.     Defendant J-M Manufacturing Company, Inc. d/b/a JM Eagle ("JM Eagle") is a California corporation with its principal place of business located at 5200 West Century Boulevard, Los Angeles, CA 90045. During the Class Period, JM Eagle or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 6. National Pipe

23.

Defendant National Pipe & Plastics, Inc. ("National Pipe"), a wholly owned subsidiary of Ireland based CRH plc, is a Delaware corporation with its principal place of business at 1 N. Page Ave, Endicott, NY 13760. During the Class Period, National Pipe or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 7. Pipelife Jet Stream

24. Defendant Pipelife Jet Stream, Inc. ("Pipelife Jet Stream") is a wholly-owned subsidiary of Austrian based Pipelife International GmbH and is a Delaware corporation with its principal place of business located at 1700 South Lincoln Street, Siloam Springs, AR 72761. During the Class Period, Pipelife Jet Stream or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 8. Otter Tail

25. Defendant Otter Tail Corporation ("Otter Tail") is a Minnesota corporation with its principal place of business at 215 South Cascade Street, Fergus Falls, MN 56538. During the Class Period, Otter Tail or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

26. Defendant Northern Pipe Products, Inc. ("Northern Pipe") is a wholly-owned subsidiary of Defendant Otter Tail and is a North Dakota corporation with its principal place of business at 1302 39th Street NW, Fargo, ND 58102-2808. During the Class Period, Northern Pipe or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

27. Defendant Vinyltech Corporation ("Vinyltech") is a wholly-owned subsidiary of Defendant Otter Tail and is an Arizona corporation with its principal place of business at 8825 N. 23rd Avenue, Suite 100, Phoenix, AZ 85021. During the Class Period, Vinyltech or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy

alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District. Defendant Otter Tail controls Defendant Vinyltech both generally and with respect to the conduct of Otter Tail in furtherance of the unlawful acts alleged in this Complaint.

28.    Defendant Otter Tail controls both Northern Pipe and Vinyltech generally and with respect to the conduct of Otter Tail in furtherance of the unlawful acts alleged in this Complaint.

29.    Defendants Otter Tail, Northern Pipe, and Vinyltech are collectively referred to herein as "Otter Tail."

### 9.    Prime Conduit

30.    Defendant Prime Conduit, Inc. ("Prime"), a Delaware corporation, is a wholly owned subsidiary of Japan based Mitsubishi Corporation with its principal place of business at 23240 Chagrin Boulevard, Suite 405, Cleveland, Ohio. During the Class Period, Prime or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 10.    Sanderson Pipe

31.    Defendant Sanderson Pipe Corporation ("Sanderson Pipe") is a Delaware corporation with its principal place of business at 875 International Blvd., Clarksville, TN 37040. During the Class Period, Sanderson Pipe or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

### 11. Westlake

32.     Defendant Westlake Corporation ("Westlake Corp.") is a Delaware corporation with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston TX 77056-6110. During the Class Period, Westlake Corp. or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

33.     Defendant Westlake Pipe & Fittings Corporation (f/k/a NAPCO Pipe & Fittings) d/b/a North America PVC Pipe Corporation ("Westlake Pipe") is a wholly-owned subsidiary of Defendant Westlake Corp. and is a Delaware corporation with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston TX 77056-6110. During the Class Period, Westlake Pipe or its predecessors, wholly-owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and manufactured and sold PVCPs in interstate commerce in the United States and its territories, including in this District.

34.     Defendant Westlake Corp. controls Westlake Pipe both generally and with respect to the conduct of Westlake Corp. in furtherance of the unlawful acts alleged in this Complaint.

35.     Defendants Westlake Corp. and Westlake Pipe are collectively referred to herein as "Westlake."

36.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

37.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

11

38.     Each Defendant acted as the principal, agent, with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## IV.     FACTUAL ALLEGATIONS

### A.     PVCPs, Generally

#### 1.     PVCPs Are Critical Commodities

39.     PVCP is an indispensable component of U.S. infrastructure, playing a crucial role across various sectors due to its durability, cost-effectiveness, and versatility. Unlike metal pipes, PVCP does not rust or corrode and is also extremely resistant to chemical deterioration, ensuring a longer lifespan and reducing maintenance costs. PVCP is also easier to install and cheaper compared to many other conduit materials. PVCP installation is approximately 30% faster compared to other materials used for piping. This makes PVCPs essential for quick and efficient deployment of new infrastructure as well as for updating and replacing old infrastructure.

40.     One of the key applications of PVCP pipes is as conduits for high-tech industries, which are vital for the nation's economic growth and technological advancement, especially as the United States seeks to invest and update critical high-tech infrastructure. High-tech industries, including telecommunications, data centers, hospital systems, transportation, energy sectors, and more, rely heavily on PVCP conduits for protecting and routing electrical and data cables.

41.     PVCPs are also used extensively in construction for plumbing and water pipes, wastewater, air ventilation, and more. PVCP is by far the most widely used material for piping, accounting for approximately 66% of water distribution piping and approximately 75% of sanitary sewer piping. PVCP is also used extensively in water and sewage systems, but also has a variety of other key infrastructure uses due to its durability, bendability, as well as chemical and extreme temperature resistance. PVCP ensures a reliable and safe supply of drinking water to communities across the country.

### 2. How PVCPs Are Made

42.     PVCPs are manufactured via an extrusion method. PVC chloride powder and other additives are mixed together through a high-speed mixing and blending process and heated to a temperature of around 120°C, after which the blend is automatically discharged into a cooling chamber which rapidly reduces the temperature to around 50°C.

43.     The heart of the process – the extruder – has a temperature-controlled zoned barrel which mixes the raw materials and convert the dry blend into the required "melt" state, by heat, pressure, and shear. The PVC passes through a number of zones that compress, homogenize, and vent the melt stream. The final zone increases the pressure to extrude the melt through the head and die set which is shaped according to the size of the pipe required and flow characteristics of the melt stream. Once the pipe leaves the extrusion die, it is sized by passing through a precision sizing sleeve with external vacuum. This is sufficient to harden the exterior layer of PVC and hold the pipe diameter during final cooling in a controlled water-cooling chamber. The pipe is pulled through the sizing and cooling operations by the puller and an in-line printer marks the pipes at regular intervals, with identification according to size, class, type, date, standard number, and extruder number. An automatic cut-off saw cuts the pipe to the required length:

**Extrusion**



### 3. How PVCPs Are Marketed in The United States

44. PVCPs are sold in the United States through a combination of Converter Defendants' internal sales forces and representatives. For example, Westlake stated that, "[i]n North America, we operate 38 leased and 6 owned distribution centers and warehouses that service and supply our products to local customers, contractors and distributors. We also engage in advertising programs primarily directed at trade professionals and homeowners that are intended to develop awareness and interest in our products. In addition, we display our products at trade shows. Our 12 PVC Compounds facilities across the world sell through a combination of our internal sales force and distributors."

### B. Opportunities to Collude at Trade Association Meetings

45. Defendants Atkore, Diamond Plastics, IPEX, Jet Stream by PipeLife, JM Eagle, National Pipe & Plastics, Northern Pipe Products, Sanderson Pipe, Vinyltech Corporation and Westlake are members of the Uni-Bell PVC Pipe Association ("PVCPA"). According to Bruce Hollands, the executive director of PVCPA, "The pipe producers, which represent 95 percent of

14

the PVC pipe manufacturing capacity in North America, are the biggest contributors to the association . . . . All the major PVC pipe converters are members of the association."

46. The PVCPA conducts annual multi-day meetings and other events through which Converter Defendants can communicate with one another in person, and Converter Defendants' executives regularly attend these events and socialize during dinners and golf outings.

47. Executives from Converter Defendants have served on the PVCPA Board of Directors during the Class Period, including:

    a. Matt Siegel, Vice President Sales, National Pipe;

    b. Eric Howard, President, Sanderson Pipe;

    c. Chuck Clark, Director of Productions, JM Eagle;

    d. John E. Britton, President & CEO, Diamond;

    e. Andre Battistin, Vice President, Westlake;

    f. Travis Lutes, President & Chief Operating Officer, Ipex;

    g. Veso Sobot, Director of Corporate Affairs, Ipex;

    h. Wayne Voorhees, Vice President of Manufacturing, Jet Stream; and

    i. Jeff Sherman, Vice President & General Manager, Atkore.

48. Upon information and belief, CEOs and top-level executives from Converter Defendants attending PVCPA events discuss topics with one another relating to pricing, production, sales, and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing, sales, and production in the PVCP industry give CEOs and top-level executives comfort that their competitors have remained committed to a plan to artificially raise the prices of PVCPs.

15

49.     One of the PVCPA's "major goals" is to "gather, consolidate and disseminate industry sales, marketing and production data."

50.     Defendants Atkore, Cantex, IPEX, Jet Stream, JM Eagle, National Pipe, Prime, Westlake, and Sanderson are also members of the Plastic Pipe and Fittings Association ("PPFA"). Among other things, the PPFA conducts yearly Fall and Spring meetings, including the following meetings: July 27, 2020 Virtual Fall Meeting, March 5-12, 2021 Virtual Spring meeting; 2022 Spring Meeting held on Mar. 6-8 in Indian Wells, CA, 2022 Fall Meeting held on Oct. 2-4 in Colorado Springs, CO, 2023 Spring Meeting held on Mar. 5-7 in Tucson, AZ, 2023 Fall Meeting held on Oct. 1-3 in Naples, FL;  and 2024 Spring Meeting held on Mar. 3-5 in Rancho Mirage, CA.

### C.     OPIS Report

51.     OPIS is a commodity pricing service that publishes various industry reports including the OPIS Report – the industry's only source for PVC pipe prices. OPIS promises that the report provides "access to pricing backed by a methodology that reflects today's market conditions" and is "developed with the industry's market-makers." The Opis Report requires a paid subscription and is delivered weekly on Friday via email. All the major PVC pipe converters subscribe to the report and are asked to contribute to its content.

52.     To create the OPIS Report, OPIS market assessors monitor and analyze the PVCP market throughout each week by constant communication with PVCP converters in order to discover completed deals, bids and offers. Additionally, OPIS market assessors receive deal sheets from active market participants detailing their market activities. PVCP manufacturers' data are collected by OPIS "through various channels including telephone calls, e-mails, instant messaging, electronic platforms and electronic transfer of back office deal sheets." OPIS market assessors

communicate with PVCP converters "via electronic instant messaging (e.g., ICE IM, CME Pivot, AIM), email and telephone communication."

53.     The OPIS Report is broken down into the three types of PVC pipe: municipal water, plumbing, and electrical conduit. OPIS also publishes PVC pipe prices based on the data and information collected from market participants, including transactions and outstanding offers. The "Midpoint" price is the price used by industry participants as a benchmark in index-based contracts:

## PVC PIPE PRICES

| Municipal Pipe (Blocks) | Low | High | Midpoint |
|---|---|---|---|
| 9/9/2022 | 440 | 440 | 440.00 |
| 9/2/2022 | 440 | 440 | 440.00 |
| 8/26/2022 | 440 | 440 | 440.00 |
| 8/19/2022 | 440 | 450 | 445.00 |
| | | | |
| Plumbing Pipe (East $/ft) | Low | High | Midpoint |
| 9/9/2022 | 4.23 | 4.48 | 4.36 |
| 9/2/2022 | 4.23 | 4.48 | 4.36 |
| 8/26/2022 | 4.25 | 4.50 | 4.38 |
| 8/19/2022 | 4.25 | 4.50 | 4.38 |
| | | | |
| Conduit Pipe (East $/100 ft) | Low | High | Midpoint |
| 9/9/2022 | 665 | 675 | 670.00 |
| 9/2/2022 | 672 | 682 | 677.00 |
| 8/26/2022 | 675 | 685 | 680.00 |
| 8/19/2022 | 675 | 690 | 682.50 |

54.     The OPIS Report also consists of PVCP manufacturers' commentary. The commentary section of this report often includes specific forward-pricing intentions and invitations to coordinate pricing. It is the main mode of communication between competitors that has enabled them to fix the price of PVC pipes.

**D.     Converter Defendants' Price Increases During the Class Period**

55.     Converter Defendants entered into an illegal agreement to inflate and fix the price of PVCPs sold in the United States and its territories. The OPIS Reports during that period provide direct evidence of the agreement and its successful execution. Below are examples of the competitively sensitive pricing information PVCP converters exchanged through OPIS in furtherance of their anticompetitive agreement.

56.     On January 22, 2021, the OPIS Report stated:

While some market participants believed that the market needed to be reset with a new price letter close to the current price level, others said there is no reason converters can't push prices higher without a new price letter. The only requirement would be discipline.

57.     On October 28, 2022. the OPIS Report stated:


There was no change in municipal pipe pricing this week. The market was still firmly at Block 40. Converters conceded that demand has diminished significantly from the heady days when backlogs were 12 weeks or more out and customers were on allocation. The steep drop in pipe demand makes it all the more remarkable that prices have remained rock solid at Block 440. .... Converters see no reason for prices to drop rapidly once they do start to retreat, as they have shown discipline thus far and see no reason why that should change.

58.     The November 4, 2022 the OPIS Report stated:

Converters reported that recently there had been some cases of buyers fishing for a lower price by claiming that a competitor had sold to them at a lower number, but a phone call or two proved that this was not the case. So far, nobody has blinked . . . converters said they have resigned themselves to the fact that demand will be very low in Nov[ember], Dec[ember], Jan[uary] and Feb[ruary] and that dropping their price won't get them more volume.

59.     On January 27, 2023, the OPIS Report stated, "Diamond, National, Sanderson and Jet Stream had previously issued price increase letters at Block 445 for immediate sales and Block 450 for quotes, effective Feb 1. . . .Westlake Pipe & Fittings issued its price increase letter at Blocks 445/450 on Friday, effective Jan 30."

60.     On February 3, 2023, the OPIS Report stated:

Converters had rallied around a price increase for Feb 1 which would push municipal pipe prices up to Block 445 for immediate sales and Block 450 for quotes. Some competitors had only grudgingly joined the effort, as they felt a price hike was not warranted due to the fact that municipal pipe prices have been stable at Block 440 for 40 weeks in a row while PVC prices had fallen by 42 cpp in 2H 2022.

61.     On February 10, 2023, the OPIS Report stated, "While the increase announcements had been unanimous, not all converters were particularly enthusiastic about the idea of trying to push prices higher in early Feb. They said demand was still too low to support raising prices." But they raised prices anyway.

62.     On May 26, 2023, the OPIS Report stated:

Some market participants viewed the new sheets more as an effort to stem the price erosion that has gripped the market rather than a true effort to push prices higher. With resin prices predicted to drop in May and June and demand still moribund, they said there doesn't seem to be either a demand pull or a cost push to move prices higher. On the other hand, some converters believed that as the originator of the new sheets Atkore needs to take a hard stand next week on new business at the higher price levels.

63.     On February 16, 2024, the OPIS Report stated:

Converters will know by the end of next week if Jan[uary] resin prices will be flat, and if their cost for resin is still predicted to increase by 2 cpp for Feb[ruary]. This may give them the backbone to stop the slide in prices, competitors said, and try to recoup this impending loss of margin. Some converters expect that new price sheets will be issues for Mar[ch]. They said the sheets will need to be issued at a level below that of the Jan[uary] sheets, as those are now too high above current market levels.

64.     On February 23, 2024, the OPIS Report stated:

There was talk in the market this week that the new pipe sheets for Mar[ch] might be coming out next week. But, some converters said, if competitors go out next week and try to lock up a bunch of volume before a Mar[ch] price increase can take effect, they won't be able to raise prices at all. Converters found out this week that their resin costs could possibly rise by a total of 5-6 cpp for Feb[ruary] and Mar[ch] purchases. They concluded that they not only need to stop the slide in their pipe

prices, but they must push them higher if they don't want to lose more margin to due to the higher resin prices.

65.     Following the PVCPA's 2024 annual meeting on February 26-28, 2024, on March 15, 2024, the OPIS Report stated, "Competitors said everyone needs to start moving prices up on business written from now on."

66.     On March 22, 2024, the OPIS Report stated:

Last Friday, Westlake issued a price increase letter taking municipal pipe prices to Block 390 for immediate shipment (for all diameters) and Block 400 for standard quotes, effective Mar 18. National, Jet Stream, IPEX, Atkore, Diamond, Sanderson and JM Eagle followed with similar letters, effective Mar 18 or 19. As usual, Northern and Vinyl Tech did not issue price increase letters, but said they would be raising their prices to the same level.

67.     On April 5, 2024, the OPIS Report stated:

The hope is that prices will continue to move up next week. Some competitors were still upset because a market leader took hold for release orders at low prices that keep prices static through May for 10-truck orders and through Jun for 20-truck orders. The converter in question reported that none of the hold for release trucks were left in the Northeast, so that shouldn't be affecting prices anymore.

68.     On May 3, 2024, the OPIS Report stated, "Converters said the price hikes won't work unless everyone is working together to implement them."

69.     On May 10, 2024, the OPIS Report stated, "Converters hope to push prices higher next week, but concede it will have to be a unanimous effort to have any chance of success."

70.     According to OPIS, the Converter Defendants' "unanimous" price increase effort in May 2024 succeeded in driving Conduit prices up from $3.70/ft on May 3 to $3.80/ft on May 24.

71.     On June 21, 2024, the OPIS Report stated:

With a total of 4 cpp in resin price increases on the table, converters acknowledged they will need to try again to raise prices. This time, some said, they need to put out price letters with an increase of no more than 10 Blocks above the current market

and all aim for the same implementation date. Then, if that increase is successful, do it again.

72.     On June 21, 2024, the OPIS Report stated:

Converters conceded they need to figure out how to push prices higher. The consensus this week was for a single price increase that would take prices up by about 5% over the current market level, with another percentage added to account for the discount. Then, if that works, do it again and again until it stops working. Conduit converters have been successful with this strategy in the past.

73.     On June 28, 2024, the OPIS Report stated, "Converters lost no time in starting a price increase effort," and detailed how six electrical conduit converters Atkore, Cantex, Prime, National and IPEX issued identical price sheets across the United States for PVC electrical pipe.

74.     On July 12, 2024, the OPIS Report stated:

With six cents in resin price increases staring converters in the face for Jun, Jul and Aug, the consensus was that they need to get serious about pushing prices up ... Some converters said they need to return to the tactics they had employed a few years ago of going up by only 5 Blocks at a time but doing it repeatedly until their desired price level was achieved.

75.     On July 19, 2024, the OPIS Report stated, "Most converters were concerned about the constant erosion of their margins, but were waiting for a market leader to announce a price hike for them to follow."

76.     Defendants coordinated actions resulted in higher prices of Conduit PVCPs (priced in dollars per hundred feet), Plumbing PVCPs (priced on a $ per foot basis), and municipal PVCPs (priced in Blocks, a tiered pricing strategy in which manufacturers set different prices for different quantities of product, generally incentivizing bulk purchases with a decreased per-foot cost). Block pricing is frequently relevant in the context of large, municipal water projects. PVC pipe sold for municipal water projects constitute 64% of the finished PVC pipe market, and therefore, these large transactions have a major impact on PVC pipe prices.[12]

77.    By April 2021, the prices of all three types of PVCPs had increased dramatically and remained elevated:



78.    In addition, as discussed in paragraphs 9-11 above, (1) the price of the primary raw material used in the manufacturing of PVCPs, PVC resin, stayed flat during the Class Period, while the price of PVCPs increased dramatically, (2) the ratio of pipe to resin price was fairly stable at approximately 1.5 until approximately April 2021, when PVCP shot up to be 50 percent more expensive than resin, and (3) the spread between the actual price of PVCP and the forecasted price, based on the price of resin widened substantially during the Class Period and is an indicator of the harm to Plaintiff and class members of the overcharge.

**E.    Normal Market Forces Do Not Explain Converter Defendants' Price Increases**

79.    Converter Defendants have justified their price increases during the Class Period by citing increases in input costs and supply chain constraints. For example, on August 24, 2023,

United Pipe & Steel, a master distributor, announced that "PVC pipe mills have announced an increase of approximately 8% due to the rising costs of PVC raw materials. This increase will go into effect on Friday, 9/1, with a new list price sheet."

80.　　However, Converter Defendants' extraordinary price increases of PVCPs cannot be explained by normal market forces. PVC resin is the primary ingredient used in the production of PVCPs, accounting for 92%-95% of the raw materials used to manufacture PVCPs. As is clear from the above graphs the increase in the price of PVCPs has not been due to changes in the price of resin. Further, there has been no corresponding increase in the demand for residential and non-residential construction that would account for the large increases in PVCP prices since April 2021.

**F.　　Converter Defendants' Artificially Inflated Price Increases Resulted in Record Operating Profit Margins**

81.　　Figure 3 above shows the spread between PVCP price and the cost of the primary raw material, PVC resin, during the Class Period. As depicted, this approximation of Converter Defendants' profit margins (PVCP price minus resin price, the area between the blue and orange lines) were driven to never-before seen levels during the Class Period.

82.　　The profit margins for Defendants Atkore, Otter Tail and Westlake (the public company Defendants) soared. For example, Defendant Otter Tail reported in its SEC filings that the price at which it sold municipal water PVC pipe was up 198%, while its sales volume was down by 23% from 2019 to 2023. Despite the lower sales, Otter Tail's PVC pipe business line grew from 23% of EBIT in 2019 to 70% in 2023, and its margins for PVC pipe exploded to 61% in 2023 from a 14% average from 2013 to 2019.

83.　　Additionally, Defendant Atkore reported in its SEC 10-K filings that the price at which it sold electrical conduit PVC pipe was up 86%, while its sales volume was down 9% from 2019 to 2023, cumulatively. The margins for that business line expanded from 17-20% in 2016-

2019, to 38% in 2023. On a February 1, 2024, earnings call, Atkore President William Waltz admitted that Atkore was trying to push PVC pipe prices up but explained that it was "harder when the demand isn't there to get them to realize, but [Atkore is] still optimistic going forward on these attempt[s] to push the prices in the industry up," noting that Atkore "always aspire[s] to increase our pricing."

84.     Defendant Westlake saw margins from its PVC pipe business grow from 13.5% in 2019 to 22.5% in 2023, as the price at which it sold PVC pipe increased 74% over the same period.

85.     On September 20, 2022, Spectrum News Cleveland reported that plumbers, like Neptune Plumbing in Ohio, "continue to see increase in pipe costs." Neptune Plumbing Co-President Mike Wallenstein told Spectrum News that "PVC pipe has gone up about 75%" and he has seen prices go "up and up and up over the past two years." Wallenstein said, "There's been a lot of volatility, a lot of market confusion going on, a lot of triggers of areas that we have never seen occur in my lifetime before."

86.     As PVCP prices remain artificially inflated, Converter Defendants profit margins will continue to remain elevated.

## G.     The Structure and Characteristics of the Market for PVCPs Support the Existence of a Conspiracy

87.     The structure and other characteristics of the market for PVCPs have made it conducive to anticompetitive conduct among Defendants and have made collusion particularly attractive.

### 1.     The Supply Side of the PVCP Market Is Highly Concentrated, and the Converter Defendants Are the Dominant Firms

88.     The presence of a small group of major sellers is one of the conditions that the United States DOJ has identified as being favorable to collusion. Put differently, a highly

concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

89.     Defendant Atkore's President, William Waltz, explained at Citi's Global Industrial Tech and Mobility Conference in February 2024 that "both industry consolidation" and "our acquisitions" have increased Atkore's margin and pricing power. Specifically, in 2013, "there was at least . . . a dozen PVC [pipe] competitors," but since that time, Atkore "bought those companies up and rolled up the industry or our other competitors."

90.     Here, Converter Defendants control more than 95% of the PVCPs sold in the United States.

91.     Because the manufacture of PVCPs is highly concentrated, with the Converter Defendants controlling most of the production, this market is highly susceptible to collusion.

### 2.     Barriers to Entry Are High

92.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.

93.     There are high barriers to entry to effectively compete in the manufacture of PVCPs, including the following: (a) the time and cost associated with effectively scaling PVCPs manufacturing operations (*i.e.*, building new production and storage facilities in closer proximity to PVCP purchasers); (b) the research and development investment required to develop new products and then support their introduction into the market; (c) sellers of the raw materials necessary to manufacture PVCPs favor the larger, entrenched manufacturers of PVCPs; and (d) the long-standing, existing relationships between PVCP converters and customers.

94.     On an April 2023 earnings call, Defendant Otter Tail's President and CEO, Charles McFarlane, confirmed that the industry has not "seen any new competition" because "[t]he cost of entry is pretty significant to build the PVC pipe plant."

95.     The high barriers to entry in the manufacture of PVCPs make it unlikely that supra-competitive prices would result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

### 3.     The Demand Side of the PVCP Market Is Unconcentrated

96.     The unconcentrated nature of the demand side of the PVCP market also makes this market susceptible to collusion.

97.     For example, over 40,000 utilities in North America use PVCPs. Such a large number of buyers, each of which has a small share of the total marketplace, means that there is less incentive for the Converter Defendants to cheat on collusive pricing arrangements, since each potential additional sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

### 4.     Demand for PVCPs Is Inelastic

98.     Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices. There are three primary characteristics that demonstrate the inelasticity of demand for PVCPs: (a) a lack of substitute goods, (b) the essential nature of PVCPs, and (c) PVCPs being a relatively small portion of the overall cost of the final good.

99.     The DOJ has also recognized that standardized products that lack substitutes is a condition favorable to collusion, as substitute goods cannot restrain price increases and temper the effects of a price-fixing conspiracy.

100. Purchasers of PVCPs do not generally view them as interchangeable with other products, nor do purchasers view there as being substitutes for PVCPs.

101. PVCP has no functional substitute for the vast majority of its commercial uses. More specifically, there is no functional substitute for plumbing and municipal PVCPs because they have several properties, in addition to size/weight ratio, that other pipes cannot replicate, including: a lifespan estimated at 100 years or more; drastically reduced failure rates; a reduced water pumping rate, thus reducing energy consumption over its prolonged lifespan; high resistance to changes in temperature; and an imperviousness to rust and other types of water-based corrosion.

102. Similarly, there is no functional substitute for PVC electrical conduits, which have several properties apart from size/weight ratio that other pipes cannot replicate, including: the ability to be easily cut and bent, making installation more efficient; protection from corrosion; not inherently conductive to electricity like many metal pipes; and a lower thermal conductivity, which results in reduced heat transfer.

103. On an August 2023 earnings call, Defendant Otter Tail President and CEO, Charles McFarlane described the inelastic demand for PVC pipe: "[P]rices have continued to stay up and stay stronger" because "the cost of the pipe [] isn't a significant component of the overall projects" and customers "need the pipe to do the projects."

## V. CLASS ACTION ALLEGATIONS

104. Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of a Class, defined as follows:

> All persons and entities who purchased PVC Pipes in the United States directly from one or more of the Converter Defendants (or from any of the Converter Defendants' parents, predecessors, subsidiaries or affiliates) at any time between April 1, 2021, and the present. Excluded from the Class are Converter Defendants, parents, predecessors, subsidiaries, and affiliates, and all federal government entities and instrumentalities of the federal government.

27

105.    Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of the Converter Defendants. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are at least hundreds of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

106.    Plaintiff will fairly and adequately represent the interests of the Class because it directly purchased PVCPs from one or more Converter Defendants, and it has no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel experienced in prosecuting antitrust class actions, as well as other complex litigation.

107.    Plaintiff's claims are typical of the claims of its fellow Class members because Plaintiff directly purchased PVCPs from one or more of the Converter Defendants named herein, and Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

108.    Numerous questions of law or fact common to the Class—including, but not limited to, those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a.    Whether Defendants combined or conspired to fix, raise, maintain, or stabilize prices of PVCPs sold at any time during the Class Period to purchasers in the United States;

b.    Whether Defendants (1) shared among themselves competitively sensitive information pertaining to the production, sale, pricing, or distribution of PVCPs, (2) concertedly fixed, raised, maintained or stabilized the price of PVCPs sold at any time during the Class Period, and (3) committed other conduct in furtherance of the conspiracy alleged herein;

c.    Whether Defendants' conduct caused the prices of PVCPs sold at any time during the Class Period to be artificially fixed, raised, maintained, or stabilized at noncompetitive prices;

d.    Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages; and

e.    Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

109.    These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

110.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

111.    This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution of the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

112.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### VI. DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS

113.    A continuing violation occurs where, as here, Defendants' anticompetitive conduct causes a continuing harm to Plaintiff and members of the Class.

114.    Plaintiff and members of the Class purchased PVCPs directly from one or more Converter Defendants, from the beginning of the Class Period until the present and will continue to do so in the future.

115.     Defendants' PVCP price fixing scheme were intended to and, in fact, did inflict continuing injury, harm, and damages on Plaintiff's and Class members businesses and property.

**CLAIM**
**VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**
**(Against All Defendants)**

116.     The preceding factual statements and allegations are incorporated by reference.

117.     Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

118.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

119.     At least as early as April 1, 2021, and continuing until present, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for PVCPs, thereby creating anticompetitive effects.

120.     Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for PVCPs throughout the United States.

121.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for PVCPs.

122.     As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for PVCPs.

123.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

30

A. Price competition in the market for PVCPs has been restrained, suppressed, and/or eliminated in the United States;

B. Prices for PVCPs sold by Converter Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C. Plaintiff and members of the Class have directly purchased PVCPs from one or more Converter Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, and have been deprived of the benefits of free and open competition in the purchase of PVCPs.

124. Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of PVCPs to be higher than it would be but for Defendants' conduct.

125. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Class have been and continue to be injured in their businesses or property by paying more for PVCPs than they would have paid or will pay in the absence of the conspiracy.

## VII. **RELIEF REQUESTED**

**WHEREFORE,** Plaintiff respectfully requests the Court to certify this action as a class action, appoint it as the class representative, and appoint its counsel as Class counsel. Plaintiff further requests that Defendants be cited to appear and answer this action, and, upon final trial or hearing, judgment be entered that the above-described PVCPs price-fixing scheme, and the above-described wrongful and anticompetitive acts engaged in by Defendants in furtherance thereof, violated Sections 1 of the Sherman Act, 15 U.S.C. § 1; and further, judgment be entered in favor of Plaintiff and members of the Class, and against Defendants, as follows:

The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act;

Plaintiff recover damages for itself and the Class to the maximum extent allowed under federal antitrust laws, and a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

Plaintiff and the Class be awarded pre- and post- judgment interest as provided by law, and such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law;

Enter an order prohibiting and permanently enjoining Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## VIII.   JURY TRIAL DEMANDED

Pursuant to FED. R. CIV. P. 38(b), Plaintiff demands a trial by jury of all issues so triable.

Date: September 26, 2024

Respectfully submitted,

By: */s/ Joseph M. Vanek*
Joseph M. Vanek
David P. Germaine
John P. Bjork
**SPERLING & SLATER, LLC**
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel:   (312) 641-3200
Email:  jvanek@sperling-law.com
       dgermaine@sperling-law.com
       jbjork@sperling-law.com

By: */s/ Phillip F. Cramer*
Phillip F. Cramer (*pro hac vice application forthcoming*)
**SPERLING & SLATER, LLC**
1221 Broadway, Suite 2140
Nashville, TN 37212
Tel: (312) 641-3200
Fax: (312) 641-6492
E-mail:  pcramer@sperling-law.com

James Almon (*pro hac vice application forthcoming*)
**SPERLING & SLATER, LLC**
2707 Killarney Way, Suite 202
Tallahassee, FL 32309
Tel:       (850) 354-5300
Fax:       (312) 641-6492
Email:  jalmon@sperling-law.com

33

Robert N. Kaplan
Matthew P. McCahill
Elana Katcher
Brandon Fox
Carihanna Morrison
**KAPLAN FOX & KILSHEIMER, LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
Tel: (212) 687-1980
Email: rkaplan@kaplanfox.com
Email: mmccahill@kaplanfox.com
Email:ekatcher@kaplanfox.com
Email:Bfox@kaplanfox.com
Email:cmorrison@kaplanfox.com

Joshua H. Grabar, Esq.
Julia Varano
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 267-507-6085

Email: jgrabar@grabarlaw.com
Email: jvarano@grabarlaw.com

Dianne M. Nast
Joseph Roda
Michael Ford
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Tel: (215) 923-9300
dnast@nastlaw.com
jnroda@nastlaw.com
mford@nastlaw.com

*Attorneys for Plaintiff Bill Wagner & Son, Inc.*

34